**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE DISTRICT OF COLORADO**

Case No.:

BRENT MILLER,

    Plaintiff,

v.

THE CITY AND COUNTY OF DENVER, a Colorado municipal corporation;
STEPHANIE O'MALLEY, in her individual capacity and in her official capacity as Executive Director of the Denver Department of Safety;
SHANNON C. ELWELL, in her individual capacity and in her official capacity as Civilian Review Administrator of the Denver Department of Safety;
ELIAS DIGGINS, in his individual capacity and in his official capacity as Interim Sheriff of the Denver Sheriff's Department;
WILLIAM THOMAS, in his individual capacity and in his official capacity as Captain at the Denver Sheriff's Department; and
PAUL ORTEGA, in his individual capacity and in his official capacity as Captain at the Denver Sheriff's Department;

    Defendants.

___

**COMPLAINT AND JURY DEMAND**
___

COMES NOW Plaintiff, Brent Miller ("Plaintiff" or "Miller"), by and through his legal counsel, Elkus Sisson & Rosenstein, P.C., and hereby submits his Complaint and Jury Demand.

### I.    PARTIES AND VENUE

1. The Plaintiff is an individual who resides at 623 Rio Rancho Way, Brighton, Colorado, 80601

2. The Defendant, The City & County of Denver (hereinafter referred to as "Denver") is a municipal corporation with administrative offices in the City & County of Denver, State of Colorado.

3. The Defendant, Stephanie O'Malley (hereinafter referred to as "O'Malley") is the Executive Director of the Manager of Safety with her administrative offices located at 1331 Cherokee Street, Room 302, Denver, Colorado 80204.  The Department of Safety is comprised of seven public safety agencies and administrative support functions that are unified through one Executive Director of Safety.  Per the Manager of Safety's website, she indicates: "[T]he Executive Director strives to improve department-wide collaboration, efficiency, customer service, accountability, transparency, and innovation through independent oversight."  The Manager of Safety is responsible for oversight, supervision, training, and discipline of both the Denver Police Department and the Denver Sheriff's Department.  At all times relevant to the subject matter of this litigation, Defendant O'Malley was a citizen of the United States and a resident of Colorado and was acting under color of state law in her capacity as the Executive Director of the Manager of Safety for the City & County of Denver.

4. The Manager of Safety, a position created by the Denver City Charter, is in charge of the Department of Safety, which has full charge and control of the Sheriff Department.  See Denver, Colo., City Charter §§ 2.6.1, 2.6.2.  "[T]he manager of safety exercises the powers and performs the duties of sheriff under the laws of the state."  See Revised Municipal Code of the City and County of Denver § 14-122.  The Manager of Safety is the "appointing authority" for purposes of Denver Career Service requirements for purposes of termination of Sheriff Department employees.  See Denver, Colo., City Charter § 2.6.4.

5. The Defendant, Shannon C. Elwell (hereinafter referred to as "Elwell") is a Civilian Review Administrator for the Denver Department of Safety. Elwell's administrative offices are located at 1331 Cherokee Street, Room 302, Denver, Colorado 80204. At all times relevant to the subject matter of this litigation, Defendant Elwell was a citizen of the United States and a resident of Colorado and was acting under color of state law in her capacity as the Civilian Review Administrator for the Denver Department of Safety for the City & County of Denver.

6. The Defendant, Elias Diggins (hereinafter referred to as "Diggins" or "Sheriff") is the Interim Sheriff of the Denver Sheriff's Department. The Sheriff has his administrative offices at the Downtown Detention Center located at 490 W. Colfax Street, Denver, Colorado 80204. At all times relevant to the subject matter of this litigation, Defendant Diggins was a citizen of the United States and a resident of Colorado and was acting under color of state law in his capacity as the Interim Sheriff for the Denver Sheriff Department.

7. The position of Sheriff was created by the Denver City Charter, and the Sheriff is appointed by the Mayor. See Denver, Colo., City Charter § 2.6.4. The Sheriff exercises the powers and duties required by the Colorado Constitution and general laws of the State of Colorado, to the extent approved by the Manager of Safety. *Id.*

8. The Defendant, William Thomas (hereinafter referred to as "Thomas") is a Captain with the Denver Sheriff's Department. Defendant Thomas is a Captain that works in the Conduct Review Office for the Denver Sheriff's Department and he has his administrative offices at 1331 Cherokee Street, Denver, Colorado 80204. At all times relevant to the subject matter of this litigation, Defendant Thomas was a citizen of the United States and a resident of

Colorado and was acting under color of state law in his capacity as a Captain for the Conduct Review Office for the Denver Sheriff Department.

9. The Defendant, Paul Ortega (hereinafter referred to as "Ortega") is a Captain with the Denver Sheriff's Department. Defendant Ortega is a Captain that works as the head of the Internal Affairs Bureau (hereinafter "IAB") for the Denver Sheriff's Department and he has his administrative offices at 5440 Roslyn Street, Suite 320, Denver, Colorado 80126. At all times relevant to the subject matter of this litigation, Defendant Thomas was a citizen of the United States and a resident of Colorado and was acting under color of state law in his capacity as a Captain for the Denver Sheriff's Department Internal Affairs Bureau.

10. Collectively, Defendants Denver, O'Malley, Elwell, Diggins, Thomas, and Ortega will be referred to as "Defendants".

## II. JURISDICTION & VENUE

11. This action arises under the Constitution and laws of the United States and 42 U.S.C. §1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343. In addition, this Court has jurisdiction to resolve any state law claims brought by the Plaintiff under 28 U.S.C. § 1367. Jurisdiction supporting Plaintiff's claim for attorney's fees is conferred by 42 U.S.C. § 1988.

12. Venue in the United States District Court for the District of Colorado is proper in that the action complained of took place in the State of Colorado, City and County of Denver, and all the parties, upon information and belief, are residents of the state.

### III. GENERAL ALLEGATIONS

13. Miller was an Adams County Deputy Sheriff for 25 years and 9 months prior to his retirement on or about October 26, 2014. Miller retired at the rank of sergeant, a position that he held for approximately 12 years.

14. On or about October 27, 2014, one year after his retirement from the Adams County Sheriff's Department, Miller was hired by the Denver Sheriff's Department to work as an on-call Senior Criminal/Civil Investigator.

15. From October 27, 2014, through an unknown date in February, 2015, Miller's supervisor was the former Arapahoe County Sheriff Grayson Robinson. Sheriff Robinson was hired by the Denver Sheriff's Department to be the interim head of IAB.

16. During the 2014 calendar year, and continuing into 2015, the Denver Sheriff's Department had a backlog of IAB cases and was being publicly criticized for the length of its investigations and the time it was taking to resolve disciplinary cases. Accordingly, in an effort to rectify these problems, the Denver Sheriff's Department engaged former Sheriff Robinson and 5 other experienced ex-law enforcement officers to fill the Senior Criminal/Civil Investigator positions.

17. At all relevant times, former Sheriff Robinson indicated that Miller's job performance met or exceeded the standards he expected of his subordinate investigators (sworn and civilian). Moreover, at no point during former Sheriff Robinson's tenure as the head of Denver Sheriff Department's IAB did he counsel or reprimand Miller for any performance-related issues.

18.  In fact, Miller's investigative reports were so thorough, complete, and well done that his reports were becoming the new standard and he was tasked with assisting other investigators in improving their job performance and report writing.

19.  After former Sheriff Robinson left the Denver Sheriff's Department IAB, Captain Ortega became the head of IAB.

20.  In December of 2014, Miller was assigned to investigate Deputy Doe's[1] involvement in a use of force incident while working off-duty at a Denny's Restaurant. Sergeant Dewitt ("Chip") Lightner was assigned to conduct the investigation with Miller. Sgt. Lightner informed Miller that there was no complainant or alleged violation of Denver Sheriff's Department (hereinafter "DSD") policy and procedure. Despite Sgt. Lightner's finding and/or recommendation of no policy violation, Sheriff Diggins nonetheless wanted Deputy Doe investigated for unknown reasons. In fact, Sergeant Joshua Frank documented in his report concerning Deputy Doe's incident that no DSD rule violations had occurred.

21.  Deputy Doe's case originally went to the Denver Police Department (hereinafter "DPD") because it involved a vehicle pursuit of a suspect that had allegedly assaulted Deputy Doe at the Denny's Restaurant. During the time DPD had the case, Miller could only review documents and video available but could not conduct any interviews until DPD was done.

22.  DPD completed their investigation and presented the case to the Denver District Attorney's Office for review. The District Attorney's Office declined to file any charges against any officer involved, but did file criminal charges against the suspect in the vehicle pursuit and the assault of Deputy Doe.

---

[1] Deputy "Doe" is being used to conceal the true identity of the underlying Denver Deputy Sheriff to protect his/her privacy interests. Defendants will be provided with the true identity of the relevant Denver Deputy Sheriff.

23. At the completion of Miller's IAB investigation, Miller found no evidence that Deputy Doe violated any of the DSD policies and procedures.

24. Accordingly, Miller recommended to his direct supervisor, former Sheriff Robinson, that the case against Deputy Doe be declined for further action because there was no evidence of any violations of DSD policy and procedures.

25. Former Sheriff Robinson agreed with Miller's recommendation and the case was sent to the Denver Office of the Independent Monitor (hereinafter "OIM") for review. Be advised, when a case is "declined for further action" that is the conclusion of the case and it is appropriately documented as such.

26. Nathanial Fuhrman, an attorney employed by the OIM, reviewed Deputy Doe's IAB case and had a question about Deputy Doe's handcuffing of an intoxicated female. Miller explained to Mr. Fuhrman that the evidence suggested that there were exigent circumstances and DSD Departmental Orders allowed for Deputy Doe to handcuff the female.

27. Specifically, the exigent circumstances were as follows:

    a. While dealing with the female inside the restaurant, the suspect vehicle with several other suspects in it had returned and was seen circling the restaurant outside "blacked out";

    b. Earlier it was alleged a gun was involved and Doe had only eliminated one person as not having the gun;

    c. The female he handcuffed was uncooperative and was causing a disturbance inside the restaurant with staff and the people they had originally started the fight with; and

    d.  Deputy Doe was still the only officer on scene and was trying to identify the suspects and get DPD there to help him.

  28.  After Miller discussed the exigent circumstances with Mr. Fuhrman, Mr. Fuhrman stated that he agreed with the recommendation to decline the Deputy Doe IAB case.

  29.  On or about January 21, 2015, the Deputy Doe case was forwarded to the Conduct Review Officer (hereinafter "CRO").

  30.  After a few days, Sgt. Lightner informed Miller that the Deputy Doe IAB case was not being accepted as a decline because Sheriff Diggins wanted it to go forward.

  31.  During the first week of April, 2015, Captain Ortega informed Miller that the CRO, *i.e.*, Captain Thomas, had questions about Miller's case summary and wanted a portion of the summary removed.

  32.  At that time, Miller met with Captain Ortega to review the summary and Captain Ortega informed Miller he did not understand what the CRO's concern was about the case summary. In fact, Captain Ortega stated that the summary was factual and supported by the evidence in the case. Captain Ortega told Miller to leave the relevant portion of the case summary in his case summary and that he would talk to the CRO, *i.e.*, Captain Thomas.

  33.  On April 6, 2015, Captain Ortega informed Miller that Ortega continued to agree with Miller but that Captain Thomas of the CRO and Shannon Elwell of the Manager of Safety's Office required that a portion of the case summary be removed.

  34.  Miller asked Captain Ortega if he was being ordered to remove the relevant information and Captain Ortega said, "Yes, that is an Order."

35. Miller told Captain Ortega that he felt it was unethical to remove facts from a case summary and that he felt it was important for a decision-maker to have all relevant facts in a case in order to make an informed decision. Captain Ortega informed Miller a second time that it was an "Order" and to remove the information.

36. Miller told Captain Ortega that he would remove the information but that he felt this was corruption and unethical and that he wanted his objection duly noted. Captain Ortega told Miller that he can document his objection in IAPro (a software program used by IAB) in the "routing" back to Captain Ortega. Miller documented in the IAPro "routing" that he removed information as ordered to do so by the CRO. Additionally, Sgt. Lightner witnessed this conversation and Miller also informed the other three civilian investigators of this "Order" to remove a portion of his investigative summary.

37. Miller was told that this Order came down from higher than the CRO and it was actually from the Manager of Safety's Office. Frustrated and conflicted with this Order, Miller chose to call Elwell at the Manager of Safety's Office.

38. On April 6, 2015, Miller spoke to Elwell via phone. Elwell informed Miller that she gave the Order to remove the information in Miller's case summary because they, *i.e.*, Denver, were going to sustain violations against Deputy Doe. Elwell was very candid, stating among other things, "we can't do that with your information in there." Miller told Elwell that the portion of his summary she wanted removed was factual information which the decision-maker should have in order to make an informed decision. Elwell told Miller that she wanted it removed and wanted the CRO to make those decisions.

39. Miller felt that Elwell's statements were "odd" because at this point in the Deputy Doe IAB investigation the CRO had yet to post his suggested findings which would merely be recommendations to Sheriff Diggins.

40. It appeared to Miller that the CRO, Sheriff Diggins, and the Manager of Safety's Office were all colluding to ensure that Deputy Doe was punished and in order to do so they wanted exculpatory evidence removed from the case summary.

41. In fact, Miller expressly told Elwell that her Order was biased, corrupt, and was not indicative of an honest and fair investigation. Elwell seemed surprised and stated to Miller, "you think this is biased?" to which Miller stated, "Yes, it's biased and corrupts the process of a fair investigation." Elwell responded with either "that's unfortunate" or "too bad." Again, Miller informed Sgt. Lightner and other civilian investigators about this conversation.

42. Within minutes of Miller's phone call with Elwell on April 6, 2015, Captain Ortega summoned Miller to his office. Captain Ortega was upset because Elwell had called him to complain to him about Miller calling her.

43. Captain Ortega seemed distraught and kept saying he was going to get fired or sent back to the floor, meaning moved out of IAB. Captain Ortega asked Miller why he would call Elwell and Miller told him that he felt strongly that the Order to remove exculpatory evidence was unethical and corrupt. Captain Ortega kept telling Miller that Miller did not understand how things are done in Denver and that Miller cannot say things like that or he won't last around here. Miller's conversation with Captain Ortega lasted about an hour and forty-five minutes and Captain Ortega continued to express a concern about his job security.

44. Captain Ortega also informed Miller that it was his understanding that Captain Thomas and Elwell thought highly of Miller's work product and even considered having him work in the CRO. Captain Ortega encouraged Miller to reach out to Captain Thomas, because he was not sure how Captain Thomas felt about Miller after Miller expressed his concerns about the Order in Deputy Doe's IAB case to remove a portion of his case summary. At about the same time, civilian investigator Larry Krisl told Miller that Captain Ortega had approached him and discussed how he should handle Miller in light of his comments in the Deputy Doe case.

45. Subsequently, Miller approached Captain Thomas to inquire about whether he was serious about Miller working in the CRO and Captain Thomas said that he had been serious but now he has questions.

46. On May 7, 2015, Captain Thomas and Miller met in the third floor break room at the 5440 Roslyn Street location. Captain Thomas and Miller spoke about the Deputy Doe case and the possibility of Miller working for him in the CRO. Captain Thomas said that he wanted Miller to work in the CRO until he saw the routing in IAPro in the Deputy Doe IAB case. Specifically, Captain Thomas stated, "you can't do that…if you're told to do something you just do it and don't ask." Miller told him that if he was looking for a "yes man" or somebody that would not stand up against unethical issues or corruption that he was not the guy. During this conversation with Captain Thomas, Captain Thomas stated something along the lines of, "if you want to survive you just do what you're told and don't ask questions…that is the Denver way".

47. Prior to May 5, 2015, Miller was assigned to two unrelated cases involving Inmate Christopher Colbruno (hereinafter "Colbruno"). These unrelated cases concerned

11

incidents that occurred on January 17, 2015, and February 4, 2015, respectively, which arose out of Colbruno's grievance(s) on a kite[2] and a letter that he wrote to the OIM.

48. On or about May 5, 2015, Captain Ortega informed Miller that Colbruno had another issue and that Miller would be assigned the case. The conversation occurred at Miller's cubicle and in the presence of civilian investigator Armando Saldate.

49. On or about May 6 or 7, 2015, Miller had a second conversation with Captain Ortega about the third Colbruno case which concerned the issue of whether there should be three separate IAB cases or just one IAB case. Captain Ortega decided that there would be three separate Colbruno cases.

50. The third Colbruno case originated by a complaint lodged by hospital staff at Denver Health Medical Center (hereinafter "DHMC"). The complaint was that Denver Deputy Sheriffs walked Colbruno into DHMC nude except for orange mittens over his hands while he was handcuffed. This was documented on video and by written complaint from DHMC staff.

51. Miller and civilian investigator, Chris Bakas, drove to DHMC to retrieve the relevant video evidence for the third Colbruno case. Miller waited in the vehicle while Mr. Bakas went into DHMC to retrieve the video.

52. Miller reviewed the footage which was comprised of two short videos approximately 30 seconds in length. Miller decided to burn both videos onto one disc for efficiency.

53. On Monday, May 11, 2015, Captain Ortega asked Miller if he had uploaded the video to IAPro yet and Miller told him, "no." Captain Ortega then stated, "Good, don't. The

---

[2] "Kites" are forms used by inmates to send messages to each other.

case has been taken care of…they are making that go away." Miller responded, "who is they?" Captain Ortega informed Miller that it was the "Sheriff."

54. Miller informed Captain Ortega that there was a complaint of misconduct and it should be investigated. Captain Ortega responded, "I know, but it's not a case. Get rid of the video…lose it." At that point, Miller informed Captain Ortega that it is not right, unethical, and improper to destroy evidence.

55. Miller immediately went and reported the incident to two outcry witnesses, Chris Bakas and Armando Saldate (two civilian investigators in IAB). Miller was in shock as he informed Mr. Bakas and Mr. Saldate of the events that had just occurred. Miller informed Mr. Bakas and Mr. Saldate that this was not right and that he could not be a part of destroying and/or intentionally losing evidence in an IAB case.

56. The next day, on May 12, 2015, Miller was called into Captain Ortega's office together with Sgt. Joe Garcia. Miller was informed by Captain Ortega that the Sheriff and the Manager of Safety wanted to let him go. Miller was presented official Notification of his Termination which was dated May 11, 2015, and signed by Sheriff Diggins. However, as reflected in the certificate of service the Notice of Termination was not presented to Miller until May 12, 2015. *See* Notice of Termination dated May 11, 2015 attached hereto as **Exhibit 1**. Captain Ortega informed Miller that he was being terminated for being "too opinionated." Miller expressly asked Captain Ortega if his termination had anything to do with his job performance and Captain Ortega said, "no, your job performance is excellent." During Miller's tenure at Denver he has no history of counseling, discipline, or any other measures to inform him or correct any deficiencies in his job performance.

57. Miller's last day of employment at Denver was on May 14, 2015. Miller left the video of the third Colbruno case with civilian investigator Armando Saldate to ensure that the video evidence was preserved.

58. Upon information and belief, Sheriff Diggins contacted Carol Rogers at DHMC to discuss the third Colbruno case and whether or not an investigation was necessary. Apparently after Diggins' contact with Ms. Rogers she agreed that an investigation into the matter was not necessary.

59. Defendants have established a "general or informal" rule against disagreeing with or opposing the destruction of evidence in IAB cases which constitutes an *informal custom*. This is referred by Captain Thomas as the "Denver Way." There is a pattern and practice of pressuring IAB investigators into manipulating or destroying evidence to achieve Defendants' desired outcome in a case. Upon information and belief, based on their respective authoritative positions within the City and County of Denver and their adherence to follow and enforce an illegal policy (as set forth more fully above) these Defendants caused, ratified and/or influenced the termination of Miller.

60. A municipality is liable for the single unconstitutional act of a final decision/policy-maker. Sheriff Diggins is a final decision/policy-maker by virtue of his duties and responsibilities as set forth by Denver City Charter, the Colorado Constitution, and the general laws of the State of Colorado. See Denver, Colo., City Charter § 2.6.4. Moreover, Sheriff Diggins if a final decision/policy-maker by virtue of the duties and responsibilities delegated to him and approved by the Manager of Safety.

61. The municipality may also be liable because there are facts in the record which establish that the Manager of Safety ratified and approved Sheriff Diggins' decision to terminate Miller.

62. As a result of the actions of the Defendants described above, Miller has suffered injury, including but not limited to, loss of income, loss of employment and retirement benefits, loss of professional and career opportunities, injury to reputation, emotional distress, and pain and suffering.

**FIRST CAUSE OF ACTION – 42 U.S.C. §1983 FIRST AMENDMENT VIOLATION – RETALIATION v. ALL DEFENDANTS**

63. Miller hereby incorporates by reference all averments in this Complaint.

64. In an effort to disclose evidence of corruption, impropriety, or other malfeasance on the part of public officials, *i.e.*, Defendants as set forth above, Miller engaged in the constitutionally protected activity of opposing the destruction of evidence (namely the Colbruno video) to the Defendants as set forth expressly above. Moreover, Miller engaged in the constitutionally protected activity of reporting truthful allegations of corruption, impropriety, or other malfeasance to Defendants and outcry witnesses as set forth above in an effort to try and stop it.

65. Miller's speech involves a matter of public concern in that he disclosed the corruption, impropriety, and other malfeasance on the part of a public officials, *i.e.*, Defendants. "Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of [public] officials, in terms of content, clearly concerns matter of public import." *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988); *see also Considine v. Board of County*

15

*Comm'rs*, 910 F.2d 695, 700 (10th Cir. 1990) (discussing Tenth Circuit cases in which whistle blowing activity was held to touch on matters of public concern); *Prager v. LaFaver*, 180 F.3d 1185 (10th Cir. 1999).

66. Miller's interest in disclosing the corruption, impropriety and other malfeasance on the part of a public official, *i.e.*, Defendants, outweighs the Defendants' interest in regulating that speech.

67. Miller's expression of his speech was the substantial or motivating factor driving Defendants' decision to terminate his employment. At that time, Miller had no documented performance or disciplinary issues.

68. Defendants clearly would not have taken the same employment action of terminating Miller if Miller would not have opposed, reported, and disclosed the corruption, impropriety, and other malfeasance on the part of Defendants.

69. Defendants' actions caused Miller to suffer injuries that would chill a person of ordinary firmness from continuing to engage in such constitutionally protected activity.

70. Defendants' conduct violated clearly established rights belonging to Miller, of which reasonable persons in Defendants' position knew or should have known.

71. Defendants' acts were done under color of state law.

72. Defendants engaged in the conduct described by this Complaint intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Miller's federally protected constitutional rights.

73. Defendants' conduct proximately caused significant injuries, damages and losses to Miller. Specifically, Miller has suffered loss of wages, loss of job, loss of benefits, loss of

seniority, other economic losses, emotional pain, suffering, humiliation, inconvenience, emotional distress, mental anguish, and loss of enjoyment of life.

74. The actions of the Defendants violate the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Court enter judgment for the Plaintiff and against the Defendants and award to the Plaintiff:

a. injunctive relief requiring the Defendants to remedy all adverse employment actions taken against the Plaintiff by the Defendants, including, but not limited to, an order reinstating the Plaintiff to his employment with the Denver Sheriff's Department and an order requiring the Defendants to cease and desist from any future retaliation against Plaintiff;

b. damages for all injuries suffered by the Plaintiff, including, but not limited to, damages for loss of income, loss of employment and retirement benefits, loss of employment, professional and career opportunities, injury to reputation, and emotional distress;

c. punitive damages;

d. Pre-judgment and post-judgment interest;

e. costs and reasonable attorney fees; and

f. such other and further relief as this Court deems just and proper.

# JURY DEMAND

**PLAINTIFF DEMANDS TRIAL BY JURY OF ALL CLAIMS AND ISSUES SO TRIABLE.**

Respectfully submitted this 2nd day of June, 2015.

                              **ELKUS SISSON & ROSENSTEIN, P.C.**

                              */s/ Donald C. Sisson*
                              Donald C. Sisson,
                              Reid J. Elkus,
                              Scott D. McLeod
                              Attorneys for Plaintiff
                              ELKUS SISSON & ROSENSTEIN, P.C.
                              501 S. Cherry Street, Suite #920
                              Denver, Colorado 80246
                              (303) 567-7981 (phone)
                              (303) 431-3753 (fax)
                              dsisson@elkusandsisson.com
                              relkus@elkusandsisson.com
                              smcleod@elkusandsisson.com

Plaintiff's Address:
623 Rio Rancho Way
Brighton, Colorado 80601